1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CAROLINE LI, | CASE NO. 2:22-CV-00444-LK |
| Plaintiff, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY |
| v. | |
| NORTHEASTERN UNIVERSITY, | |
| Defendant. | |

This matter comes before the Court on Defendant Northeastern University's Motion for Summary Judgment, Dkt. No. 32, and Plaintiff Caroline Li's Cross Motion for Partial Summary Judgment Re Failure to Accommodate, Dkt. No. 38. Also before the Court is Northeastern's Motion Under LCR 16(b)(4) to Exclude Plaintiff's Proffered "ADA Expert." Dkt. No. 30.

This is an employment discrimination case. Li worked as a Marketing Manager for Northeastern's Seattle Campus from September 2016 to August 2020. After she began experiencing physical pain-related limitations at work, she requested—and eventually received— a standing desk and mat for her office workstation. Li's pain nonetheless worsened. She then took intermittent FMLA leave to mitigate and address her chronic pain. Amidst this occasional leave,

Li received a negative performance review and was placed on a performance improvement plan. Intermittent leave ultimately proved ineffective for combatting her symptoms. Li consequently resorted to 36 weeks of continuous short-term disability leave but was forced to return to work after long-term disability benefits were denied. Prompted by Northeastern, Li submitted an ADA accommodation request detailing her work restrictions and setting forth the accommodation she felt was necessary to perform her job: speech-to-text software. Northeastern, however, denied the request because it determined that Li's medical restrictions prevented her from performing the essential job functions of the Marketing Manager position even with an accommodation. Northeastern then terminated her employment without further ado.

Northeastern maintains that it is entitled to summary judgment on Li's three WLAD claims: failure to accommodate, disparate treatment, and retaliation. Li, on the other hand, contends that Northeastern's efforts during the interactive process were so abysmal that no triable issue of fact remains with respect to her failure to accommodate claim. The Court disagrees on both counts. Fair-minded jurors could differ as to (1) whether Li was qualified to perform her essential job functions with a reasonable accommodation and (2) whether Northeastern adequately participated in the interactive process and, ultimately, reasonably accommodated Li's disability. But there is no evidence to support Li's contention that the adverse employment actions taken against her were pretext for discriminatory or retaliatory motives. Her claims for disparate treatment and retaliation therefore fail as a matter of law. Last, and with respect to Northeastern's motion to exclude, the Court agrees that Dr. Peter Blanck's opinions are unfit for the jury because they are not premised on a reliable methodology.

## I.   BACKGROUND

Some of the following facts appear in the Court's Order Denying Leave to Amend Complaint. Dkt. No. 29. For ease of reference, the Court reproduces that background here and

1    supplements it as necessary.

2    A.    **Li's Troubles Begin**

3            Northeastern hired Li in September 2016 as a Marketing Manager for its Seattle campus.

4    Dkt. No. 1-1 at 4. At some point during the late summer or early fall of 2017, Northeastern

5    temporarily relocated its administrative staff (including Li) to the fourth floor of their office

6    building. *Id.*; Dkt. No. 44 at 1–2. That floor was allegedly furnished with "low quality and

7    uncomfortable tables, desks, and chairs." Dkt. No. 1-1 at 4. More specifically, the desks were not

8    adjustable and the chairs "were old, offered no ergonomic support, and broke frequently." *Id.* Li's

9    feet did not touch the floor while seated in her chair and the armrests prevented her from "being

10   able to sit close enough to type on [her] computer[] in a comfortable position." *Id.* She alleges that

11   as a result, she began to experience neck and back pain. *Id.* at 5.

12           Li requested a standing desk for her workspace but was told by the operations manager that

13   Northeastern would not pay for one. *Id.* After an associate dean witnessed Li stretching in pain,

14   however, she apparently requested a standing desk on Li's behalf. *Id.* Four months passed before

15   the operations manager told Li that she needed a doctor's note to obtain a standing desk. *Id.* In

16   January 2018, Li's doctor provided that note and Northeastern ordered her a standing desk. *Id.* at

17   5; Dkt. No. 33-1 at 60 (doctor's note indicating that "long hours in a sitting position without proper

18   posture support and working on the computer [was] creating neck, upper back, and shoulder pain"

19   for Li, and opining that an "ergonomic workstation with standing options throughout the day is

20   expected to decrease musculoskeletal problems."); *see also id.* at 62–63 (email correspondence

21   arranging for standing desk). In the meantime, though, Li "began to lose feeling in her fingers and

22   experienced a burning sensation in her hands." Dkt. No. 1-1 at 5. She was diagnosed with carpel

23   tunnel syndrome in March 2018. *Id.*; *see also* Dkt. No. 39-1 at 30 (Virginia Morris vocational

24   evaluation report reflecting that Li was diagnosed on March 28, 2018 with, among other ailments,

cervicalgia, radiculopathy, and carpal tunnel syndrome); *id.* at 68 (John Cary rebuttal report indicating that Matt Brown-Ruegg evaluated Li on March 28, 2018 and assessed, among other diagnoses, "left carpal tunnel syndrome").

This marked the beginning of a year-long period during which Li's symptoms worsened. Dkt. No. 1-1 at 5. Then, in April 2019, Li received an "inconsistent" performance rating. Dkt. No. 33-1 at 65–66. The review praised Li for several "areas of strength." *Id.* at 65. For example, she had "innovative" strategies, had a "passion for creative content," and was "adept at building content across multiple media formats" and "skilled in implementing organic social media[.]" *Id.* The review likewise acknowledged Li's "[t]echnical skillset in copy, design, and digital asset development[.]" *Id.* ("Caroline has the ability to write copy, edit/manipulate existing creative as well as generate original creative assets."). Despite these positive remarks, though, the review mostly criticized Li for poor use of time and her tendency to prioritize content marketing projects "at the expense of other, often more critical, aspects of her role." *Id.* It specifically flagged as "areas for future development" Li's lack of focus on "top-of-funnel" content; "pattern of not proactively communicating high profile activity with key stakeholders"; "[p]attern of not scheduling adequate time for projects" and missing deadlines that created "late work or fire drills for other teams"; lack of proficiency in Marketo;[1] and "[r]epeated issues with following [f]inance policies." *Id.* The negative performance review further identified Li's "[p]lanned/unscheduled absences and lack of time in office" as "having a negative impact on [her] productivity." *Id.* She apparently submitted time-off requests "last minute" and "often" worked from home "without providing her team a heads up[.]" *Id.* To remedy this deficiency, the performance review urged Li to submit and obtain approval for remote work and other flexible work hours "in advance," and to

---

[1] Marketo is a brand of marketing automation software.

communicate those hours "to Seattle partners and to Director[.]" *Id.* at 66.

**B.   Li Takes Intermittent FLMA Leave and Is Placed on a Performance Improvement Plan**

Li provided Northeastern with another doctor's note roughly a month after her negative performance review. Dr. Eliza Sutton indicated in the note that Li was suffering from "chronic neck, upper back, and arm pain which periodically flares up, requiring her to take a periodic day off of work due to pain and reduced function, up to [two] days per month." *Id.* at 69. Dr. Sutton also requested that Northeastern "arrange [an] ergonomic evaluation and optimization of [Li's] work station, and provide [Li] with worker's comp and FMLA forms" so that she could complete the physician's portion of those documents. *Id.* Senior Benefits Specialist Mel Shea subsequently emailed Li confirming receipt of Dr. Sutton's letter and directing Li to submit a request for ergonomic evaluation of her workstation with the Office of Institutional Diversity and Inclusion ("OIDI"). *Id.* at 68. Li maintains that she did not receive an ergonomic assessment for her workstation or any worker's compensation paperwork. Dkt. No. 44 at 3; *see also* Dkt. No. 48-1 at 2–4.

In June 2019, Northeastern approved intermittent FMLA leave (up to one day per week, and three doctor appointments per week for four weeks) through December 30, 2019. Dkt. No. 33-1 at 73, 75. This leave plan was revised in September to permit up to two appointments per week for three weeks, followed by two single-appointment weeks through mid-October. *Id.* at 78. And in November, Northeastern again revised Li's intermittent FMLA leave to permit four single-appointment weeks followed by four weeks with an appointment every other week. *Id.* at 81. It also reduced the leave period by 10 days to terminate on December 20, 2019. *Id.*

Meanwhile, in August 2019, Li was diagnosed with osteoarthritis of the jaw and began physical therapy. Dkt. No. 1-1 at 6. She also informed Director of Regional Marketing Gwen Brady

that "her health was deteriorating because her workload was too extreme and she did not have enough time off to physically recover." *Id.* Li asked Northeastern to create an assistant marketing position or, alternatively, hire a new Marketing Manager and reclassify her as a part-time contractor. *Id.* Northeastern declined this request. *Id.* ("Gwen Brady told [Li] that the decision had been made not to hire another marketing employee for budgetary reasons.").[2] In late October 2019, Lauren Wamelink (Li's immediate supervisor) drafted a three-page Performance Improvement Plan ("PIP") again flagging "serious concerns regarding [Li's] performance as Marketing Manager" and outlining "expectations moving forward." Dkt. No. 33-1 at 84. The PIP referenced Li's "inconsistent" performance review and indicated that the previously identified areas for improvement "continued to be of significant concern." *Id.* More specifically, Li "regularly require[d] stakeholders . . . to follow up multiple times" given her failure to communicate; failed to participate in a timely manner or at all in domain meetings; failed to adequately prepare for monthly meetings; was behind on regional lead generation goals for the year; was not using the marketing plan to properly prioritize work (and instead prioritized tasks according to her interests); "present[ed] a general disregard for [her] role and responsibilities and communicate[d] that openly to members of the staff"; completed work that was "out of [her] scope"; and failed to timely submit expense reports. *Id.* at 84–85.

Wamelink further chastised Li in the PIP for her "excessive number of unplanned absences" and decisions to work from home "without providing any notice or requesting permission to do so[.]" *Id.* at 85. Additionally, Li often missed meetings "without communicating

---

[2] Li alleges that her proposal for an assistant originated during a one-on-one meeting with Lauren Wamelink, her immediate supervisor, sometime in 2019. Dkt. No. 44 at 3. According to Li, she told Wamelink that "things were getting hard for [her], that [she] was in a lot of pain, and that the adjustable desk was not helping." *Id.* When she asked Wamelink whether Northeastern would accommodate her by hiring an assistant, Wamelink apparently told her that "there was nothing they could do for [her], but that some people in [her] situation had just quit." *Id.* Wamelink then allegedly told Li to "take it up with the boss, Cindy Gallitin." *Id.* Gwen Brady thereafter helped Li "put together a proposal" for Gallitin and Dean Dave Thurman—one in which Li would assume a contractor role. *Id.*

to anyone that [she] w[ould] not be there" and then failed to follow up on notes or action items from those missed meetings. *Id.* The PIP set forth a comprehensive plan going forward to address these issues. *See id.* at 86. Of note here is Wamelink's admonition that Li must request planned time off "with as much advanced notice as possible" while unplanned time off "(i.e., sick time) must be reduced drastically[.]" *Id.* ("[A]ny unplanned absence should be clearly communicated to your manager with as much advanced notice as possible."). Flexible work arrangements (e.g., work from home days) were to be requested "at least [one] week in advance," otherwise Li was expected "to be in the office at the Seattle campus." *Id.* at 87. Wamelink concluded the October 2019 PIP by instructing Li that the two would "meet weekly" for "appropriate feedback on [Li's] performance." *Id.* These weekly meetings were supplemented with a "mid-point check in" 30 days out, followed by a final check in 60 days out to definitively determine whether Li had "successfully met [Wamelink's] expectations." *Id.* And finally, Wamelink conveyed her "commit[ment] to [Li's] success" as a Marketing Manager and desire "to see immediate and sustained improvement"; however, she warned that failure to improve would "lead to further disciplinary action up to and including termination." *Id.*

**C.      Li Takes Continuous FMLA Leave and Inquires about Long-Term Disability and Worker's Compensation**

The "mid-point check in" never happened because Li experienced a "mental breakdown" in December 2019. *Id.* at 95. While on a work trip in San Francisco, Li received an email from Northeastern's Dean, Dave Thurman, inquiring about "a plan for advertising graduation on social media" because he had not "seen anything on [Northeastern's] campus F[acebook] or LinkedIn accounts." *Id.* at 92. Li responded by indicating that she "was not planning on any social [media] other than posting any available photos" after the graduation. *Id.* Thurman was less than enthused by this. In his reply, he reminded Li that this was Northeastern's "first ever winter graduation" and

"worthy of some press." *Id.* at 91. Because the remainder of Li's team was "consumed with graduation logistics already," he recommended that she not expect any assistance with covering the event. *Id.* Thurman went on to set forth his expectations and emphasized that, as Marketing Manager, this was Li's responsibility and she needed to "own the task." *Id.*; *see also id.* at 92 (listing ideas for Li in covering graduation).

This upset Li. *See id.* at 29 ("And he replies back not very nicely and kind of retaliated against me. . . . I felt like I wasn't supported. I had no allies. I didn't know what to do at this point."). After "working away" for a while she went to bed, but awoke the following morning in such bad pain that she could not move. *Id.* at 29–30 ("I mean I'm literally crying. I can't get out of bed. . . . I felt horrible, and I had a breakdown because at that point I had been going on long enough that I was—just a blur."); *see also* Dkt. No. 1-1 at 6; Dkt. No. 44 at 4. This was a "turning point[]" for Li. Dkt. No. 33-1 at 29. She determined that intermittent FMLA leave was not "working" for her and resolved to take a "big chunk" of time off. *Id.* Li emailed Mel Shea the next day apprising her of the recent "mental breakdown" and detailing her chronic pain, stress levels, and need for extended time off. *Id.* at 95.

Northeastern thereafter approved continuous FMLA leave for December 16, 2019 through February 28, 2020. *Id.* at 98. It later extended this leave through June 12, 2020. *Id.* at 100, 109. Li received her full salary between December 16th and January 30th by using 26 sick days. *Id.* at 109. And she continued to receive full pay between January 31st and April 15th by supplementing her short-term disability benefits with 21.4 vacation days. *Id.* Between April 16th and June 12th, however, Li collected only 60% of her salary pursuant to Northeastern's short-term disability policy. *Id.*; *see also* Dkt. No. 32 at 6 n.5 (explaining Li's compensation during FMLA leave); Dkt. No. 33-2 at 15 (Mel Shea email to Li breaking down payment during leave).

Beginning in late February 2020, Li exchanged several emails with Shea about applying

for long-term disability benefits because her doctor advised against returning to "this line of work where [she] need[ed] to be at a computer for several hours a day." Dkt. No. 33-1 at 104. Shea responded by explaining that, if Li was unable to return and still disabled at the conclusion of short-term leave, Northeastern would file a long-term disability claim with Lincoln Financial (its vendor) on her behalf. *Id.* at 103. Li pressed for immediate submission of her application. In reply, she indicated that she wanted to "get ahead" of the application process and "minimize risk of not being covered" given "the healthcare system being overwhelmed[.]" *Id.* Shea accordingly told Li that they would submit a long-term disability claim on her behalf "[i]n the next couple of weeks[.]" *Id.* Shea further explained that Lincoln Financial's "threshold for [long-term] disability and requirements are much greater than [what was] required for [Li's] current [short-term] medical leave," and promised to schedule a call to "walk [Li] through the [long-term disability] process and provide [her] with a Lincoln Financial questionnaire to complete in preparation[.]" *Id.* at 102–103. Finally, Shea noted that if Lincoln Financial denied Li's long-term disability claim, she "would have the chance to return to work immediately with the approval of [her] physician." *Id.* at 102.

In late April 2020, however, Li altered course in a follow-up email to Shea. There Li stated that she believed she "should be applying for worker's compensation" rather than long-term disability. *Id.* at 102 ("I was injured on the job. I emailed you in Dec[ember] and said that something happened at work and I was unable to move my neck the next day."). Li claimed that she had been diagnosed with Degenerative Joint Disease and could "no longer sit or stand and type for more than 15 min[utes] without neck and back pain and [her] jaw locking." *Id.* According to Li, she would "no longer be able to perform office work since [her] condition is degenerative." *Id.* Li therefore asked Shea to "walk [her] through" the worker's compensation claim process. *Id.* Later that same day, though, Li again reversed course in another email to Shea. This time Li

conveyed a renewed desire to apply for long-term disability benefits because she had consulted an attorney. Dkt. No. 33-2 at 18; *see also* Dkt. No. 48-1 at 6 (Shea's email responding to Li).

The next day, Li emailed Shea a July 2019 doctor's note calling for an ergonomic evaluation of Li's workspace and provision of worker's compensation forms. Dkt. No. 48-1 at 5–6. Shea responded by reminding Li that any request for an ergonomic evaluation would need to go through OIDI. *Id.* at 5. She further observed that Li had been instructed on three previous occasions to contact OIDI and, with respect to the worker's compensation process, the Risk Department. *Id.* After Li expressed continued confusion with the proper channel for obtaining an ergonomic evaluation, Shea stated that she would "check with someone in ADA" and the Environmental Health and Safety Team because the process "might have changed" since Shea first instructed Li to contact OIDI nearly a year earlier. *Id.* at 3. Li responded by asking whether this was "still necessary" because she would "not be able to go back to work" given her injury, nor would she "be able to perform this type of office work ever again." *Id.* Shea indicated that it was not necessary "unless [Li] wanted to follow up on [her] request in case [she] did return to work." *Id.* at 2. Here again, Shea cautioned Li that she did not know whether Lincoln Financial would approve long-term disability benefits. *Id.* Li thanked Shea for the information and reiterated her desire to initiate the long-term disability application process. *See id.*

**D.    Li Unsuccessfully Applies for Worker's Compensation, Long-Term Disability Benefits, and an ADA Accommodation**

Li filed a worker's compensation claim with the Department of Labor and Industries at the end of April 2020. *See* Dkt. No. 26-4 at 2.[3] And, on May 1st, she applied for long-term disability

---

[3] The Department denied Li's claim in December 2020 after determining that her injuries were not work-related. Dkt. No. 33-2 at 25; Dkt. No. 26-1 at 5. Although she appealed that decision, she subsequently dismissed the appeal. Dkt. No. 26-1 at 5; *see also* Dkt. No. 26-8 at 4, 158–59 (notes documenting withdrawal of appeal); *id.* at 39 (September 24, 2021 Board of Industrial Insurance Appeals order dismissing appeal). Li testified during her deposition that she abandoned the appeal because she could not afford an attorney and a medical expert. Dkt. No. 33-1 at 6–7.

benefits. Dkt. No. 33-1 at 107. Lincoln Financial denied Li's claim in July. *Id.* at 111. Shea then authored a letter to Li memorializing the denial and noting Northeastern's expectation that she return to work. *Id.* at 114. Additionally, Shea reminded Li that she must provide medical documentation releasing her to return to work. *Id.* The letter concluded by instructing Li to contact Shana Feggins, the ADA Program Manager, if she believed that she needed an accommodation to perform the essential functions of her job. *Id.* Li did not provide this documentation. Nor did she submit an accommodation request—at least not initially. Instead, Li represented to Shea that she could not return to work and was not pursuing an accommodation. *Id.* at 116.

Wamelink sent Li a letter, too. She warned Li that, consistent with Northeastern's leave of absence policy, Li would be terminated for job abandonment if she did not return to work. *Id.* at 118. Li changed her mind soon thereafter. In a series of emails to Feggins, Li inquired about the accommodation process. *Id.* at 120–27. Li and Feggins also spoke over the phone about possible accommodations, including Li's preference for Dragon software. Dkt. No. 45 at 5; *see* Dkt. No. 33-1 at 129 (notes from phone call between Feggins and Li).[4] The Notes from this phone call indicate that the two discussed "[a]lternative events," "[h]elping with recruiting at events," and other "job duties" and "[e]vents" that Li "[w]ould jump in to help with" on the Seattle Campus. Dkt. No. 33-1 at 129. Li ultimately submitted an accommodation request. *Id.* at 127, 131–33 (request form). There she indicated that she suffered from left temporomandibular joint disorder, osteoarthritis, and chronic cervical pain. *Id.* at 132. Li described her limitations as "[t]yping, sitting, eating, [and] talking for long periods of time," and proposed speech-to-text technology as an accommodation "for typing and emailing needs." *Id.*

Li's chiropractor, Dr. David Mobley, confirmed these restrictions in a signed Medical

---

[4] Dragon is a brand of speech-to-text software.

Documentation and Authorization Form. *See* Dkt. No 33-2 at 2–5. He specified that Li's condition is permanent and, with or without medical treatment, substantially impairs the following life activities: speaking, communicating, eating, sleeping, working, walking, standing, bending, lifting, performing manual tasks, learning, reading, concentrating, and sitting. *Id.* at 3. As particularly relevant here, Dr. Mobley specified that Li could not type for more than 30 minutes per day, sit for more than an hour per day, eat for more than 30 minutes at a time, or talk for more than 60 minutes at a time. *Id.* at 4. He advised against Li returning to her "[r]egular/previous role" and "highly recommended" that the above tasks be broken up to "avoid acute exacerbations of pain." *Id.* In explaining why this accommodation was necessary, Dr. Mobley opined that "[a]voiding repetitive movements (typing, eating, sitting, talking) reduces stress on the structures of the jaw, neck, and upper back." *Id.* at 5. Unless Li limited her movements accordingly, "severe pain/neck spasm [would be] likely to return." *Id.*

### E.   Northeastern Denies Li's Accommodation Request and Terminates Her Employment; Li Sues

Northeastern denied Li's accommodation request on August 27, 2020. *Id.* at 7–8. In a two-page letter, Feggins clarified that Northeastern was basing its denial on Li's inability to perform the essential functions of her job: "The essential functions of your position require typing, sitting, and talking for periods of time beyond the limits outlined by your physician. Even with an accommodation of speech to text technology, your restrictions prevent you from performing the essential functions of your position." *Id.* at 7. The same day, Associate Vice President Mallik Sundharam authored a second letter to Li documenting the history of her FMLA leave and unsuccessful applications for long-term disability benefits and an accommodation. *See id.* at 10–11. Sundharam next noted that Li had now been on leave for "over 36 weeks" and Northeastern could no longer "keep [her] position open[.]" *Id.* at 11. Accordingly, Northeastern elected to

terminate Li's employment as Marketing Manager effective the following day. *Id.*

In March 2022, Li sued Northeastern in King County Superior Court for retaliatory discharge (Count 1), disparate treatment (Count 2), and failure to accommodate her disability (Count 3)—all causes of action under the Washington Law Against Discrimination ("WLAD"). Dkt. No. 1-1 at 2, 8–9; *see* Wash. Rev. Code §§ 49.60.180(2), 49.60.180(3), 49.60.210(1). Northeastern timely removed the case to federal district court. Dkt. No. 1 at 4. Following discovery, the parties cross-moved for summary judgment—although Li seeks only partial summary judgment on her failure to accommodate claim. *See* Dkt. Nos. 32, 38. Northeastern also moved to exclude Li's proffered ADA expert, Peter Blanck. Dkt. No. 30.

## II.   DISCUSSION

The Court first confirms its jurisdiction. It then addresses the parties' motions for summary judgment before turning to Northeastern's motion to exclude.

### A.   Jurisdiction

Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists[.]" *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Northeastern invoked the Court's diversity jurisdiction as the basis for removal in this case. Dkt. No. 1 at 2; *see* 28 U.S.C. § 1441(a). The Court's diversity jurisdiction extends to all civil actions where the matter in controversy exceeds $75,000 and the action is between citizens of different states. 28 U.S.C. § 1332(a)(1). The Ninth Circuit, however, strictly construes the removal statute against removal jurisdiction. *See Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1056–1057 (9th Cir. 2018). "The 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (per curiam). The Court finds that Section 1332(a)(1)'s two requirements are met.

First, there is complete diversity because Li is a citizen of Washington and Northeastern is

a citizen of Massachusetts. Dkt. No. 1 at 2; *see Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001) (each plaintiff must be a citizen of a different state than each of the defendants). And second, Northeastern plausibly alleges that the amount in controversy exceeds $75,000. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2017). "[W]here, as here, it is unclear or ambiguous from the face of a state-court complaint whether the requisite amount in controversy is plead, the removing defendant bears the burden of establishing, by a preponderance of the evidence, that the amount in controversy exceeds the jurisdictional threshold." *Urbino v. Orkin Servs. Of Cal., Inc.*, 726 F.3d 1118, 1121–22 (9th Cir. 2013) (cleaned up). Li's complaint does not quantify an exact amount. It instead seeks "[d]amages for lost wages, back pay, front pay, lost benefits, medical expenses, . . . all other economic losses," and "[r]easonable attorney's fees and costs as authorized by the WLAD." Dkt. No. 1-1 at 10. Northeastern argues that the jurisdictional minimum is nonetheless met because Li "reasonably could recover more than $75,000 through trial in backpay alone[.]" Dkt. No. 1 at 3. She also demands "attorneys' fees and costs, which itself is reasonably expected to exceed the $75,000 amount in controversy requirement." *Id.* The Court accordingly finds that Northeastern has established that it is more likely than not that the amount in controversy exceeds $75,000.

**B.    Motions for Summary Judgment**

As previewed above, the Court finds triable issues of fact that preclude summary judgment for either party on Li's reasonable accommodation claim. Not so with respect to her claims for disparate treatment and retaliation. Those fail as a matter of law. And finally, the Court agrees with Li that four of Northeastern's affirmative defenses must be dismissed.

1.    Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

When parties file simultaneous cross-motions for summary judgment on the same claim, the Court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also Tulalip Tribes of Wash. V. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." (cleaned up)). The Court "giv[es] the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. V. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). However, to the extent the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

To establish that a fact cannot be genuinely disputed, the movant can either cite the record or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the movant has made such a showing, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis, internal quotation marks, and citation omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to "scour the record in search of a genuine issue of

triable fact"; rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Kennan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (cleaned up). The Court will enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### 2. WLAD Claims

The Washington Legislature enacted the WLAD to eliminate and prevent discrimination in employment based on, among other things, "the presence of any sensory, mental, or physical disability[.]" Wash. Rev. Code § 49.60.010; *see also Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1063–64 (Wash. 2021). The statute accordingly recognizes a "right to obtain and hold employment without discrimination[.]" Wash. Rev. Code § 49.60.030(1)(a). Any individual "deeming . . . herself injured by any act in violation of" the WLAD may bring a private action for injunctive relief and damages. Wash. Rev. Code § 49.60.030(2). The WLAD's protections are "broad," *Currier v. Northland Servs., Inc.*, 332 P.3d 1006, 1011 (Wash. Ct. App. 2014), and the Court will construe its provisions liberally, Wash. Rev. Code. § 49.60.020; *see also Martini v. Boeing Co.*, 971 P.2d 45, 55 (Wash. 1999).

"Claims arising under the WLAD are typically inappropriate for resolution at summary judgment because the WLAD mandates liberal construction and the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Gamble v. City of Seattle*, 431 P.3d 1091, 1094 (Wash. Ct. App. 2018) (cleaned up). The Court will, however, grant summary judgment against an employee if she "fails to raise a genuine issue of fact on one or more prima facie elements." *Johnson v. Chevron U.S.A., Inc.*, 244 P.3d 438, 443 (Wash. Ct. App. 2010); *see also Marquis v. City of Spokane*, 922 P.2d 43, 48 (Wash. 1996) (to survive summary judgment, the employee "must do more than express an

opinion or make conclusory statements," and "must establish specific and material facts to support each element of his or her prima facie case").

### (a) Failure to Accommodate

Li contends that Northeastern failed to reasonably accommodate her physical limitations by denying her request for speech-to-text technology and terminating her employment instead of engaging in an interactive process. Dkt. No. 1-1 at 9. Both parties move for summary judgment on this claim. Dkt. No. 32 at 10–13; Dkt. No. 38 at 6–13.

"An employer's failure to accommodate a disability constitutes discrimination unless the employer demonstrates that accommodation would result in an undue hardship." *Lindblad v. Boeing Co.*, 31 P.3d 1, 3 (Wash. Ct. App. 2001). To state a claim for failure to accommodate, an employee must show that (1) she suffered from a disability; (2) she was qualified to do the job in question; (3) she gave notice of the disability to the employer; and (4) the employer failed to reasonably accommodate the disability. *LaRose v. King Cnty.*, 437 P.3d 701, 721 (Wash. Ct. App. 2019); *Slack v. Luke*, 370 P.3d 49, 54 (Wash. Ct. App. 2016). Northeastern does not dispute the first and third elements. Dkt. No. 38 at 8–9; Dkt. No. 42 at 6; Dkt. No. 47 at 10. This claim therefore turns on whether Li was qualified to perform the essential functions of her job and, if so, whether Northeastern failed to reasonably accommodate her disability. The Court finds that triable issues of fact preclude summary judgment with respect to both elements.

### (i)  Element 2: Qualification to Perform Essential Job Functions

Northeastern maintains that Li was not qualified to perform the essential functions of the Marketing Manager position. It points to her inability to do so even with the speech-to-text technology that was already installed on her work computer. Dkt. No. 47 at 10–15. Li disagrees. She counters that she could have performed the essential functions had Northeastern provided a reasonable accommodation—including speech-to-text software. Dkt. No. 38 at 10–13.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY - 17

"Washington law is well settled that to prove a claim for failure to accommodate, a plaintiff must demonstrate that he or she can perform the essential functions of the job as determined and applied by the employer—not that the employer could revamp the essential functions of a job to fit the employee." *Fey v. State*, 300 P.3d 435, 444 (Wash. Ct. App. 2013). Thus, an employer is not required "to alter the fundamental nature of the job, or eliminate or reassign essential job functions." *Pulcino v. Fed. Express Corp.*, 9 P.3d 787, 795 (Wash. 2000), *overruled in part on other grounds by McClarty v. Totem Elec.*, 137 P.3d 844 (Wash. 2006), *superseded by statute as recognized in In re Est. of Hambleton*, 335 P.3d 398 (Wash. 2014). And an employer "may discharge a handicapped employee who is unable to perform an essential function of the job, without attempting to accommodate that deficiency." *Clarke v. Shoreline Sch. Dist. No. 412*, 720 P.2d 793, 803 (Wash. 1986) (vision- and hearing-impaired teacher was not qualified to supervise special education students because maintaining their safety and welfare was an essential function of the job); *see also, e.g.*, *Davis v. Microsoft Corp.*, 70 P.3d 126, 133 (Wash. 2003) (plaintiff was not qualified to perform essential functions of systems engineer, which required "a varying number of hours per day," "frequent out-of-state travel," and "well more than 40 hours a week," because his disability "limited him to a structured workweek of no more than 40 hours per week and 8 hours per day"); *Dedman v. Wash. Pers. Appeals Bd.*, 989 P.2d 1214, 1222 (Wash. Ct. App. 1999) (plaintiff could not perform the essential functions of a correctional officer's job because her disabilities precluded her from restraining inmates).

Northeastern likens the circumstances at hand to those in the cases cited above. It argues that Li could not perform the essential functions of the Marketing Manager position because "her doctor imposed severe restrictions on what she could actually do at work in August 2020." Dkt. No. 45 at 4; No. 47 at 12 ("He restricted her from the very activities that her job required of her."); *see Roness v. T-Mobile USA, Inc.*, 394 F. Supp. 3d 1324, 1332 (W.D. Wash. 2019) (explaining

that the restrictions imposed by an employee's medical condition directly bear on whether she is qualified to perform essential functions with her impairment). Namely, Northeastern points to Li's inability to type for more than 30 minutes per day or talk for more than an hour at a time. Dkt. No. 45 at 4; Dkt. No. 47 at 12. It claims that these restrictions formed a lethal combination and "eliminated any possibility of speech-to-text technology helping her perform this desk job." Dkt. No. 47 at 13–14; *see also* Dkt. No. 45 at 4 ("Eliminating all but 30 minutes per day of her ***typing*** would have dramatically increased the amount of ***talking*** she would need to do, which of course directly conflicted with her doctor's other restriction to avoid repetitive jaw motions.").

Although Li bears the ultimate burden of persuading the fact finder that she could perform the essential functions of the job, because Northeastern disputes her ability to do so, it must put forth evidence establishing those functions. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (en banc) (recognizing that the employer is in possession of much of the information that determines the essential functions). The parties appear to disagree over whether the ability to type and speak for periods in excess of Li's restrictions was an essential job function of the Marketing Manager in August 2020. "An essential job function usually refers to the ability to perform a discrete task assigned by the employer to the worker's job position." *Kries v. WA-SPOK Primary Care, LLC*, 362 P.3d 974, 985 (Wash. Ct. App. 2015). Washington courts look to the WLAD's federal counterpart, the ADA, to interpret "essential functions." *Davis*, 70 P.3d at 132. The federal regulations define that term as "the fundamental job duties of the employment position," but make clear that it "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). The Washington Supreme Court has elaborated:

> Properly understood, an "essential function" is a job duty that is fundamental, basic, necessary, and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence or substance of the job. Additionally, job duties are aptly defined as obligatory tasks, conduct, service, or functions enjoined by order or usage according to rank, occupation, or profession. The term

> "functions" (or "job duties") cannot be construed simply as "tasks"; rather, the term "essential functions" must refer not only to the tasks and activities that are indispensable to the job, but also to the "conduct" and "service" required of the employee.

*Davis*, 70 P.3d at 132 (cleaned up); *accord Kries*, 362 P.3d at 986. Aside from that, the federal regulations enumerate seven criteria to consider when determining which job functions are "essential": (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the amount of time spent performing the function at issue; (4) the consequences of not requiring the employee to perform the function at issue; (5) the terms of a collective bargaining agreement; (6) the experience of past employees in the job; and (7) the experience of current employees in similar jobs. *Dedman*, 989 P.2d at 1218 (citing 29 C.F.R. § 1630.2(n)(3)).

The Court lends some weight to Northeastern's representation that typing for more than 30 minutes a day and speaking for more than an hour at a time were essential functions. Beyond that bare representation, though, Northeastern has presented no evidence that physically typing with one's hands for more than 30 minutes a day and talking for more than 60 minutes at a time were essential functions. The job description makes no mention of either. It instead sets forth the various responsibilities of the Marketing Manager in general terms, such as developing and implementing "a fully integrated marketing and communications plan to support the strategic vision and new student enrollment goals for Northeastern University Seattle." Dkt. No. 33-1 at 56. Other responsibilities include generating leads and contributing to "the conversion of qualified leads to applicants"; developing and executing "annual program- and audience-specific marketing plans and tactics to generate interest and demand for the designated portfolio of the Seattle Hub"; executing, tracking, and reporting on marketing plans; monitoring budgets and production timelines; and managing vendor relationships and business processes related to the execution of all communications. *Id.*

1        Nor does the "Qualifications" section of the job description specify expectations regarding

2    the volume and duration of typing or talking. Although there is mention of "[e]xceptional

3    communication skills"—among other assets—the enumerated qualifications are mostly comprised

4    of experience-related benchmarks. *Id.* at 56–57; *see Bates*, 511 F.3d at 990 (noting that "essential

5    functions" are not to be confused with "qualification standards," which are "personal and

6    professional attributes"). The "Key Responsibilities & Accountabilities" section does quantify (in

7    terms of percentage) the time the Marketing Manager spends on certain responsibilities, but the

8    descriptions are again framed in terms of overall responsibilities and goals—not the physical

9    demands of an office setting. For example, the Marketing Manager is expected to spend 70 percent

10   of her time developing, implementing, and managing an enrollment marketing strategy. *Id.* at 57.

11   This requires a "strong knowledge and experience in digital marketing strategies," and the ability

12   to serve as the "central project manager for all Marketing projects . . . , working collaboratively

13   across Enrollment Marketing functions to ensure projects are integrated and completed

14   efficiently." *Id.* The Marketing Manager spends the remaining 30 percent of her time managing

15   relationships with internal constituencies and external partners. *Id.* This entails developing content

16   with academic leaders and colleagues, managing external vendors, and interfacing with

17   Northeastern leadership and other marketing teams. *Id.*

18       In short, the job description does not identify physically typing or talking in excess of Li's

19   restrictions as an essential function. *See* Dkt. No. 39-1 at 98 ("It is my understanding that her

20   essential job functions are described in her job description."). Northeastern concedes this but

21   protests that "no managerial job description can reasonably be expected to provide that minute

22   level of detail." Dkt. No. 45 at 4. The Court agrees that a means to accomplishing one's essential

23   job functions—such as typing and talking—can in some cases be inextricably intertwined with the

24   function. But that is not necessarily the case here. It may be that speech-to-text software and/or

other assistive technology, when combined with strategic breaks and allocation of work, could supplant physically typing and talking in excess of the identified restrictions.[5] Accordingly, the Court finds a triable issue of fact as to whether physically typing with one's hands for more than 30 minutes a day and talking for more than 60 minutes at a time are essential job functions. *See, e.g.*, *Jacobs v. Wal-Mart Stores, Inc.*, No. 3:17-CV-05988-RJB, 2019 WL 117999, at *7–8 (W.D. Wash. Jan. 7, 2019) (issue of fact whether administering immunizations is an essential job function of a staff pharmacist); *Kees v. Wallenstein*, 973 F. Supp. 1191, 1194 (W.D. Wash. 1997) (the "essential function" question is an issue of fact, not law).

With respect to Li's ability to perform those functions, Northeastern has not demonstrated that Li was unable to do the essential work simply because she already had a version of talk-to-text technology on her work computer. There is at least a triable issue of fact as to whether the existing built-in voice recognition software was an adequate accommodation. Northeastern clings to the portion of Li's deposition testimony in which she indicated that she "play[ed] around with" the software but "didn't give it a serious go." Dkt. No. 33-1 at 21; *see* Dkt. No. 32 at 13 ("[Li] can present no evidence that the speech-to-text technology she had on her work laptop was not effective because she admittedly did not seriously try to see how well it worked."); Dkt. No. 47 at 12 ("Plaintiff ignores her own admission that she had access to speech-to-text technology[.]"). But Li's failure to extensively experiment with the built-in technology does not necessarily mean it was otherwise adequate. Indeed, Northeastern ignores Li's repeated assertions that the existing

---

[5] The record is equivocal with respect to whether the Marketing Manager was truly required to talk for more than 60 minutes at a time. *See* Dkt. No. 39-1 at 10–11 (Sundharam stating that marketing managers are required "to come up with a marketing plan and present that marketing plan to . . . the . . . audience so they can collaboratively work on it, which . . . require[s] more than 60 minutes of presentation and discussion[.]"); *id.* at 50 (Morris opining that communication "is frequently required and *likely* more than 60 minutes at a time" (emphasis added)); Dkt. No. 43-1 at 6–7 (Wamelink never observed Li talking for more than 60 minutes without interruption); Dkt. No. 33-1 at 45 (A: "It's rare that you would talk constantly for 60 minutes without resting. You'd have to get a drink of water." Q: "In fact, do you think talking more than 60 minutes at a time in that role is necessary?" A: "Before. When I was actually working there, I never talked more than 60 minutes at a time.").

technology was "[n]ot very accurate" and "not as advanced." Dkt. No. 33-1 at 11, 20; *see also id.* at 21 ("I found that it was not as accurate in recognizing my speech."); *id.* at 39 ("I knew it existed, but it wasn't very good."). As Li explained, there are "premium system[s]" that reduce the inaccuracies associated with "unpaid service[s]" like the one she had on her work laptop. Li also clarified that although she gave the built-in software short shrift, it did not require extensive testing or research to determine its efficacy: "I don't think it takes more than an hour to figure out if the software's going to do its job or not." *Id.* at 21–22. Moreover, neither party explored the adequacy of *any* speech-to-text technology after Li submitted her accommodation request because Northeastern terminated her based on its position that she could not perform the essential functions of her job "[e]ven with an accommodation of speech to text technology." Dkt. No. 33-2 at 7.

On this matter, the parties' experts offer competing views. Northeastern's vocational expert, Virginia Morris, opines in her report that Li's typing and talking restrictions "would [have] significantly reduce[d] the performance of the essential functions of the job and significantly reduce[d] productivity." Dkt. No. 39-1 at 50 ("This mandatory stopping after 30 minutes or 60 minutes destroys productivity, continuity of work tasks, and performing essential functions."). Her opinion is directly contradicted by that of Li's rebuttal expert, John Cary, a vocational rehabilitation counselor who indicates that without a "trial period of speech-to-text technology, it is not possible to opine on a more probable than not basis that appropriate accommodations would not have resulted in Ms. Li's ability to continue to perform the essential functions of her position[.]" *Id.* at 81. According to Cary, "[t]here is no evidence that . . . a combination of standing, utilizing talk-to-text technology, typing up to 30 minutes per day, and sitting up to 60 minutes per day would not have allowed Ms. Li to perform the essential functions of her position[.]" *Id.* at 82.

Cary further disagrees with Morris's conclusion that Li's limitations would impair her productivity and continuity:

> Ms. Li could choose to delegate tasks according to the length and amount of time she would be required to perform any specific physical demand. She could limit customer interaction through scheduling, just as she would do if she was scheduled for another call or meeting at any particular time. . . . It is more probable than not, given the benefit of the reasonable accommodation requested, [that] Ms. Li would have been able to intersperse speaking and reading, as well as sitting and standing.

*Id.* at 83. Northeastern's suggestion that Li's use of speech-to-text technology would necessarily conflict with her talking restrictions therefore glosses over a critical detail: Li could not speak for more than an hour *at a time*—not more than an hour per day. It remains unclear how long she needed to refrain from speaking after doing so for an hour at time, whether a break after speaking for less than an hour reset or merely tolled the restriction period, and whether there was a cumulative limit for speaking in a workday, to name just a few of the lingering mysteries. A triable issue of fact thus exists as to whether Li could perform the essential functions of the Marketing Manager with a reasonable accommodation. *See, e.g.*, *Peeler v. Boeing Co.*, No. C14-0552-RSL, 2015 WL 6626537, at *1–2 (W.D. Wash. Oct. 30, 2015); *Alexander v. Boeing Co.*, No. C13-1369-RAJ, 2014 WL 3734291, at *10 (W.D. Wash. July 28, 2014).[6]

*(ii)* Element 4: Reasonable Accommodation

The parties next spar over whether Northeastern made sufficient efforts to accommodate Li's disability. More specifically, they disagree over whether Northeastern participated in the interactive process. *See, e.g.*, Dkt. No. 38 at 9–10; Dkt. No. 47 at 15–18. The Court again finds a

---

[6] In support of her motion for partial summary judgment on this element, Li cites "[t]he undisputed evidence that she currently is able to do the functions of a very similar 'desk job' at Employers Derflan and now Salesforce using accommodations like speech to text, touch screen, and a standing desk for her residential workstation." Dkt. No. 38 at 11. She also touts Morris's expert opinion, which she characterizes as "freely admit[ting] that Ms. Li is now employable[.]" *Id.* Although this may be evidence from which a fact finder could infer that Li was able to perform the essential functions of the Marketing Manager position in August 2020, it is not dispositive proof that she could. And importantly, the inquiry turns on Li's disability and attendant limitations at the time she requested an accommodation, as well as the information available to Northeastern when it had the opportunity to accommodate Li's disability. *See Frisino v. Seattle Sch. Dist. No. 1*, 249 P.3d 1044, 1052 (Wash. Ct. App. 2011). A reasonable fact finder could therefore conclude that Li's subsequent ability to perform similar or the same essential functions in another job (or her general employability years after her termination) is the product of changed circumstances and improved physical movements rather than proof that she was qualified to perform those functions in August 2020.

triable issue of fact that precludes summary judgment for either party.

"To accommodate, the employer must affirmatively take steps to help the disabled employee continue working—either at their existing position or through attempts to find a position compatible with their skills and limitations." *Gibson v. Costco Wholesale, Inc.*, 488 P.3d 869, 879 (Wash. Ct. App. 2021). Although Northeastern correctly notes that it was not obligated to provide Li her "preferred accommodation," *Doe v. Boeing Co.*, 846 P.2d 531, 537 (Wash. 1993), or "reassign [her] to a position that [was] already occupied, create a new position, or eliminate or reassign essential job functions," *Frisino*, 249 P.3d at 1049, it was still required to "*reasonably* accommodate her disability," *Griffith v. Boise Cascade, Inc.*, 45 P.3d 589, 593 (Wash. Ct. App. 2002) (emphasis added). Put differently, Northeastern was obligated to take "those steps reasonably necessary" to enable Li to perform her job. *Doe*, 846 P.2d at 537. Washington courts have repeatedly characterized reasonable accommodation as a "flexible, interactive process," and one that "envisions an exchange between employer and employee, where each party seeks and shares information to achieve the best match between the employee's capabilities and available positions." *Frisino*, 249 P.3d at 1050; *see* Wash. Rev. Code § 49.60.040(7)(d). An employer who fails to engage in the interactive process is liable if a reasonable accommodation would have been possible. *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018).[7]

Northeastern argues that it sufficiently participated in the interactive process because it provided Li a standing desk and mat, approved intermittent FMLA leave followed by 36 weeks of

---

[7] Li suggests in passing that an employer's failure to engage in the interactive process is "a separate and independent basis for liability under discrimination law." Dkt. No. 38 at 8. Washington courts "do not recognize a free-standing interactive process claim absent a possibility of accommodation as a basis of a disability discrimination claim." *Alexander*, 2014 WL 3734291, at *10; *accord Lawrence v. Star Prot. Agency, LLC*, No. 2:21-CV-00299-LK, 2023 WL 2372914, at *7 (W.D. Wash. Mar. 6, 2023). Northeastern takes Li to task on this point and accuses her of attempting to fashion an additional cause of action based on its alleged failure to engage in the interactive process. *See* Dkt. No. 47 at 17–18. The Court need not address this tiff any further, as Li clarifies in her reply brief that she "is not alleging under Washington [l]aw that there is an independent cause of action for Failure to Engage in the Interactive Process[.]" Dkt. No. 50 at 7 ("Plaintiff is simply filing this motion to have this court rule on the independent 'factual issue' of whether Northeastern engaged in the 'good faith interactive process.'").

continuous FMLA leave, and directed her to submit a reasonable accommodation request. Dkt. No. 45 at 5; Dkt. No. 47 at 15–16. It also repeatedly suggests that its efforts to accommodate Li were per se reasonable because her work laptop came equipped with built-in voice recognition software, and speech-to-text technology was the only accommodation she requested. *See, e.g.*, Dkt. No. 32 at 13 ("Plaintiff received the medically necessary accommodations she requested. She can present no evidence that the speech-to-text technology she had on her work laptop was not effective because she admittedly did not seriously try to see how well it worked."); Dkt. No. 45 at 7 ("Plaintiff speculates that Northeastern could have provided her with other allegedly reasonable accommodations, some of which she did not even seek. This distracts because Plaintiff needed only speech-to-text technology to return to work, but she refused to do so unless Northeastern provided her the brand she preferred.").

The Court agrees that providing a standing mat and desk, approving FMLA leave, and installing voice recognition software are forms of accommodation. *See, e.g.*, *Hawley v. Travelers Cos., Inc.*, No. 2:14-CV-38-RMP, 2015 WL 1884058, at *4 (E.D. Wash. Apr. 24, 2015). But those initial (and in the case of the voice recognition software, preexisting) measures alone do not insulate Northeastern from liability into perpetuity; a jury could still reasonably find that it failed to accommodate Li if it abrogated its ongoing duty to engage in the interactive process. *See Gibson*, 488 P.3d at 877 (an employer's duty to accommodate is continuing); *MacSuga v. Cnty. of Spokane*, 983 P.2d 1167, 1172 (Wash. Ct. App. 1999) (noting "frequent and exhaustive exchanges" between the employer and employee). Indeed, an employer must "ascertain whether its efforts at accommodation have been effective in order to determine whether more is required to discharge its duty." *Frisino*, 249 P.3d at 1052. And an employee has a corresponding "duty to communicate to the employer whether the accommodation was effective." *Id.* If the employer's initial attempt at accommodation fails or is ineffective, it must test other modes and will not be liable so long as

it "ultimately provides a reasonable accommodation." *Id.* at 1051.

Northeastern's insistence that Li received the only accommodation she requested thus elides the continuous, give-and-take nature of the interactive process. So does its related suggestion that it was not obligated to explore other methods of accommodation, even after it received Dr. Mobley's assessment with additional restrictions. Dkt. No. 33-2 at 2–5. The inquiry is not at an end just because Li's computer came equipped with a form of speech-to-text technology.[8] A factual issue remains as to whether Northeastern's reliance on that software—in combination with its other efforts—amounts to a reasonable accommodation in the circumstances of this case. A jury could reasonably conclude that Northeastern fell short of its obligation to engage in the interactive process by (1) failing to follow up with Li regarding the restrictions Dr. Mobley listed and possible solutions, including but not limited to use of speech-to-text technologies;[9] and (2) failing to complete an ergonomic evaluation[10] of Li's work area before concluding that she could not perform the essential functions of her job even with accommodations and terminating her employment. *See Stewart v. Snohomish Cnty. PUD No. 1*, 262 F. Supp. 3d 1089, 1105 (W.D. Wash. 2017) (employer "fell far short" of its duty to affirmatively adopt a reasonable

---

[8] Li noted in her deposition that she believed that she needed "better" speech-to-text software to perform the essential functions of her job. Dkt. No. 33-1 at 40; *see also id.* at 42 ("If I was given the ADA accommodations, you could do this job without typing if you have proper speech to text."). But again, neither party tested the adequacy of the existing software after Li submitted her accommodation request because Northeastern terminated Li.

[9] Li testified that she is currently "thriving" using a touchscreen desktop because it eliminates the need to type or use a mouse. Dkt. No. 46-1 at 28–29; Dkt. No. 33-1 at 50 ("I got a touchscreen and that helped a lot."). Although Li did not specifically request a touchscreen desktop—indeed, she did not even know about touchscreens in August 2020, *id.* at 29—the point of the interactive process is to exchange information and devise reasonable ways to accommodate an employee's limitations. That Li did not request a particular mode of accommodation (e.g., a touchscreen desktop or other then-available assistive technology) therefore misses the point.

[10] In his rebuttal report, Cary opines that "a full ergonomic evaluation should have been completed by a certified ergonomist, physical therapist, occupational therapist, or other appropriate certified professional by June 2019 at the latest." Dkt. No. 39-1 at 80. An ergonomic evaluation, according to Cary, "would have been essential to early mitigation of easily resolvable postural problems indicated in the records[.]" *Id.* Cary goes as far as to assert that, "[a]bsent this evaluation, Ms. Li could not be properly accommodated[.]" *Id.* at 81. Morris agreed during her deposition that she would have been better able to assess whether Li could perform the essential functions of her job had Northeastern hired an ergonomist and assistive technology specialist. *Id.* at 22–23.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY - 27

accommodation when it fired employee after first mode of accommodation failed "without considering other alternatives"). Or the jury could instead find Northeastern's actions reasonable given its previous attempts to accommodate Li's disabilities, Li's questionable efforts with the existing voice recognition software, her conflicting representations about wanting to return to work, and her equivocal pursuit of an ergonomic evaluation.[11] As is typically the case, then, here too the Court leaves this determination for the jury. *See Phillips v. City of Seattle*, 766 P.2d 1099, 1103 (Wash. 1989).

Northeastern overlooks another issue in its resolute conviction that Li was not qualified to perform the essential functions of the Marketing Manager position. Even if this proves true, Washington law makes clear that Northeastern had an affirmative duty to take reasonable steps towards placing Li in a vacant position for which she was qualified. *See Davis*, 70 P.3d at 134 ("The employer must take affirmative steps to assist the employee in the internal job search by determining the extent of the employee's disability, by inviting the employee to receive personal help from the employer's personnel office, and by sharing with the employee all job openings in the company."); *Clarke*, 720 P.2d at 804 ("[I]f a handicapped employee is qualified for a job within an employer's business, and an opening exists, the employer must take *affirmative* steps to help the handicapped employee fill the position."); *Griffith*, 45 P.3d at 593 (employer reasonably accommodated employee by identifying her limitations, finding a position that matched her

---

[11] Li mentioned during her deposition that she repeatedly requested—but was never provided—an assistant to help manage her workload. Dkt. No. 33-1 at 18; *see also* Dkt. No. 42 at 3 ("Li asked Wamelink whether Northeastern could help accommodate her like they did for other employees in their marketing department by giving her an assistant."). Li also testified that, after Northeastern rejected her request for an assistant, she asked for a demotion: "It was a request to basically say put me on contract. If you're not going to hire me an assistant, put me on contract so we can clearly define my roles. . . . I [was] asking basically [to] demote me." Dkt. No. 33-1 at 34. As Northeastern observes, however, an employer is not required to create new positions, revamp existing ones, or eliminate or reassign job functions. *Frisino*, 249 P.3d at 1049; *see* Dkt. No. 33-1 at 35 ("I wasn't trying to change my job description. I was trying to create a new role and define what that role was."). And Li provides no evidence that other employees were provided an assistant as an accommodation for a disability.

1  restrictions, and offering her that position); *Dedman*, 989 P.2d at 1222 ("After Dedman's physician

2  initially stated that she could not have physical contact with inmates, DOC's responsibility to

3  accommodate Dedman's disabilities was limited to locating an opening for which she was

4  qualified.").

5        And yet, there is no evidence that Northeastern made any effort to identify or direct Li to

6  another position matching her skill set and qualifications. *See* Dkt. No. 43-1 at 6 (Q: "Are you

7  aware of any attempts by any university employees to determine whether there was an open

8  position that Caroline Li could fill that did not require as much typing as the position she held?"

9  A: "No."); Dkt. No. 39-1 at 12 (Q: "[D]id you find out any information to suggest a Northeastern

10 employee had assessed whether or not Ms. Li could be reassigned to a vacant position to allow—

11 to accommodate her disability?" A: "I don't know."). Triable issues of fact remain as to whether

12 Northeastern had other open positions in August 2020, the essential functions of which Li was

13 qualified to perform with or without an accommodation. *See Dean v. Mun. of Metro. Seattle-Metro*,

14 708 P.2d 393, 400 (Wash. 1985) (the employee must prove that she "had the qualification required

15 to fill vacant positions and that the employer failed to take affirmative measures to make known

16 such job opportunities to the employee and to determine whether the employee was in fact

17 qualified for those positions.").

18       The Court does not mean to suggest that an employer must attempt every form of

19 accommodation, or that it must always choose to accommodate a disabled employee by moving

20 her to another position. The employer is entitled to select the mode of accommodation "to the

21 exclusion of others" so long as that accommodation is "adequate." *Frisino*, 249 P.3d at 1050. A

22 jury could, however, find that Northeastern failed to adequately engage in the interactive process

23 by not sufficiently exploring reassignment after previous modes of accommodation proved

24 inadequate and it determined that Li was not qualified to perform the essential functions of the

Marketing Manager.

The Court therefore denies the parties' motions for summary judgment on Li's reasonable accommodation claim.

### (b) Disparate Treatment and Retaliation

Li next alleges that Northeastern "subjected [her] to Disparate Treatment based on [her] Disability when [it] denied her accommodation requests and ultimately terminated her." Dkt. No. 1-1 at 9. She also contends that Northeastern terminated her employment in retaliation for her "multiple reasonable accommodation requests[.]" *Id.* at 8. Northeastern moves for summary judgment on both theories. Dkt. No. 32 at 13–17. Before addressing these claims, the Court sets forth the applicable burden-shifting framework.

### (i) *McDonnell Douglas* Burden-Shifting Framework

Because direct evidence of discriminatory animus is rare, plaintiffs "may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action." *Mikkelsen v. Pub. Util. Dist. No. 1*, 404 P.3d 464, 470 (Wash. 2017). And where, as here, an employee does so, Washington courts employ the *McDonnell Douglas*[12] burden-shifting framework "to determine the proper order and nature of proof for summary judgment." *Scrivener v. Clark Coll.*, 334 P.3d 541, 546 (Wash. 2014). That test places the initial burden on the employee to establish a prima facie case of discrimination. *Id.* This is "often" a "fairly low bar." *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 388 (Wash. Ct. App. 2020). If the employee can make that initial showing, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Scrivener*, 334 P.3d at 546. Finally, and only if the employer meets that burden, the employee must produce sufficient evidence to show that the employer's purported

---

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

nondiscriminatory reason for the adverse employment action was pretextual. *Id.* Despite this framework, the ultimate burden of persuasion remains with the plaintiff to show that the defendant employer intentionally discriminated or retaliated against him. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

### *(ii)* Disparate Treatment Claim

The WLAD prohibits an employer from discharging an employee or otherwise discriminating against her in terms or conditions of employment because of a disability. Wash. Rev. Code § 49.60.180(2)–(3). To establish a prima facie case of disparate treatment, an employee must show that she was (1) disabled; (2) subject to an adverse employment action; (3) doing satisfactory work; and (4) discharged under circumstances that raise a reasonable inference of discrimination. *Callahan v. Walla Walla Hous. Auth.*, 110 P.3d 782, 786 (Wash. Ct. App. 2005); *Anica v. Wal-Mart Stores, Inc.*, 84 P.3d 1231, 1236 (Wash. Ct. App. 2004).

Two adverse employment actions form the basis of Li's claim: the October 2019 PIP and her termination. Dkt. No. 42 at 10–12; *see Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 n.4 (Wash. 2018) (poor performance evaluation rating qualified as adverse employment action); *Davis v. W. One Auto. Grp.*, 166 P.3d 807, 813 (Wash. Ct. App. 2007) (termination is an adverse

employment action).[13][14] The Court assumes, without deciding, that Li can establish a prima facie case of disparate treatment based on those actions.[15] But her claim goes no further. Li cannot survive the remainder of the *McDonnell Douglas* burden-shifting framework because she has failed to produce evidence sufficient for a rational jury to conclude that either adverse action was

---

[13] Negative performance reviews are not per se adverse employment actions. Whether an action is adverse is a fact-specific inquiry that turns on the circumstances of the case as judged by a reasonable person in the plaintiff's position. *Boyd v. State*, 349 P.3d 864, 870 (Wash. Ct. App. 2015); *Tyner v. State*, 154 P.3d 920, 929 (Wash. Ct. App. 2007). An adverse employment action entails "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Marin v. King Cnty.*, 378 P.3d 203, 212 (Wash. Ct. App. 2016) (cleaned up); *see also Boyd*, 349 P.3d at 870 (the action must be "materially adverse" and involve "more than an inconvenience" or alteration of job duties); *Kirby v. City of Tacoma*, 98 P.3d 827, 833 (Wash. Ct. App. 2004) (events were disciplinary in nature and did not have a tangible impact on workload or pay). Courts in this district have therefore held that a negative performance evaluation *can* constitute an adverse employment action "if it results in a material change in the terms and conditions of employment." *Davis v. Port Angeles Sch. Dist.*, No. C20-5448-BHS-SKV, 2021 WL 8086629, at *18 (W.D. Wash. Oct. 1, 2021). Whether a particular action qualifies as adverse is typically a factual issue for the jury. *Boyd*, 349 P.3d at 870. Here, Wamelink informed Li that she "wish[ed] to see immediate and sustained improvement in the areas outlined" in the PIP. Dkt. No. 33-1 at 87. Failure to so improve "w[ould] lead to further disciplinary action up to and including termination." *Id.* It could therefore be fair to say that the PIP was "materially adverse" and involved "more than a mere inconvenience"—indeed, Li's employment status was placed in jeopardy. The Court need not definitively determine this issue, though. It suffices for now to assume, without deciding, that the PIP qualifies as an adverse employment action.

[14] Li's complaint alleges that Northeastern subjected her to disparate treatment based on her disability when it "denied her accommodation requests and ultimately terminated her." Dkt. No. 1-1 at 9. To the extent Li suggests that Northeastern's "denials" of her accommodation requests are adverse employment actions, Li's opposition brief does not elaborate on or even mention that theory. And she cites no evidence demonstrating that Northeastern's "denials" of her accommodation requests were pretexts for discriminatory animus, or that discrimination was a substantial motivating factor in its decision to deny her requests. *See Scrivener*, 334 P.3d at 546. Li's allegation that Northeastern employees "made comments evidencing a hostility toward providing accommodations because of costs" fails on similar grounds. Dkt. No. 1-1 at 8. Although Li's opposition brief makes no mention of this theory either, the Court surmises that her complaint references the email exchange between Northeastern HR employees involving her standing desk request. *See* Dkt. No. 42 at 3 (fact section of brief referencing "vetting process" for standing desk); Dkt. No. 33-1 at 62–63 (email thread). The Court struggles to see how these emails evince a hostility toward providing Li an accommodation. Anne Maria Jacobson observes in one email that "CCIS has gone to a full HR vetting process for [standing desk] requests to ensure [that] the request is legit and necessary as the expenses are climbing for [standing desks]." Dkt. No. 33-1 at 62. She likens the process to Delta Airlines' "crack down on 'support pets'" on airplanes and then asks whether Northeastern has "an official vetting policy" to approve purchase of standing desks because they are "well over $1000." *Id.* Jacobson concludes by adding that she is "happy to order" one but "just want[s] to make sure [that she's] following proper policy." *Id.* Another employee, Amy Molway, promises to "check on that" and proposes that Jacobson look into "much cheaper 'desk top' versions that [she] ha[s] seen all over campus that are around $300." *Id.* Jacobson replies by noting that Northeastern management "frown[s]" on the cheap desktop versions and indicates her intent to "go with the full standing automated versions to ensure best ergonomic benefits." *Id.* If anything, then, this email thread reflects a willingness to provide Li with a quality standing desk—not an aversion for her disability or accommodating that disability.

[15] The Court has serious doubts as to whether Li can establish all four prima facie elements. For example, Northeastern argues that Li was not doing satisfactory work "as shown by the extensive, detailed PIP she was given in [October] 2019 and Dean Thurman's email of December 11, 2019." Dkt. No. 32 at 16.

1   a pretext for discriminatory animus.

2         Northeastern has proffered legitimate, nondiscriminatory reasons for both the PIP and Li's

3   termination. *Scrivener*, 334 P.3d at 546. The employer's burden at this initial stage "is merely one

4   of production, rather than persuasion," and it "need only introduce 'evidence which, *taken as true*,

5   would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'"

6   *Mikkelsen*, 404 P.3d at 473–74 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

7   With respect to the PIP, Li points to the "Adherence to Time off Policies, Time in Office" section,

8   where Wamelink noted that Li's "[u]nplanned time off (i.e., sick time) must be reduced drastically

9   and any unplanned absence should be clearly communicated to [her] manager with as much

10  advanced notice as possible." Dkt. No. 33-1 at 86. Li claims that this evinces discriminatory

11  animus because it reprimands her for taking leave—a form of reasonable accommodation. Dkt.

12  No. 42 at 10–11. Northeastern, however, proffered a neutral (and self-evident) explanation for the

13  PIP. Namely, the PIP flagged Li's long-running deficiencies—many of which stretch back to her

14  April 2019 "inconsistent" performance rating—and established a corrective plan. *See, e.g.*, Dkt.

15  No. 33-1 at 65 (April 2019 performance rating bulleting "[p]lanned/unscheduled absences" under

16  "Areas for Future Development," and noting that "[t]ime off requests [are] sometimes submitted

17  last minute"). More specifically, Northeastern explained that Wamelink criticized Li for her

18  "excessive *unplanned* time off and her *failure to communicate* about absences," not for "taking

19  approved, planned time off for medical reasons[.]" Dkt. No. 45 at 8 (emphasis original). And

20  Northeastern supported this assertion with evidence. Wamelink testified that she "specifically said

21  'unplanned time off'" in the PIP because she "would not—absolutely not consider FMLA time [to

22  be] unplanned time off. That's planned time off." Dkt. No. 46-1 at 6–7. Wamelink emphasized

23  that Li "was absolutely expected to not be available during her FMLA approved time." *Id.* at 7.

24  Rather, she hoped "that when [Li] was going to be out above and beyond that, that she would

communicate with as much advance notice as possible." *Id.*

Northeastern likewise produced a nondiscriminatory reason for Li's termination. It "honestly and reasonably believed" that she was not qualified to perform the essential functions of the Marketing Manager position even with a reasonable accommodation. Dkt. No. 32 at 17. Northeastern based this conclusion on the opinions of Li's medical providers; namely, the limitations prescribed by Dr. Mobley. *Id.*; *see* Dkt. No. 45 at 8 ("It was those medical opinions that led Northeastern to honestly conclude that [Li]'s limitations rendered her incapable of performing the essential functions of her job even with the sole accommodation she requested[.]"). Here, too, Northeastern produced evidence in support of its neutral explanation. *See* Dkt. No. 33-2 at 7 (letter denying accommodation request and explaining why, even with an accommodation, Li could not perform essential functions of her position). Li's FMLA leave expired when Lincoln Financial denied her application for long-term disability benefits. *Id.* at 10. Sundharam and Shea then instructed Li that she would be terminated for job abandonment if she did not return to work. *Id.* And when Li indicated that she was unable to return to work, she was directed to apply for an ADA accommodation—a request that was subsequently denied because, again, Northeastern determined that she could not perform the essential functions of the position even with an accommodation. *Id.* at 7, 11. Thus, and as Sundharam explained in his termination letter, Northeastern could not "keep [the] position open any longer." *Id.* at 11. This evidence satisfies Northeastern's burden of production because, if true, it permits the conclusion that there was a nondiscriminatory reason for both adverse actions. *Mikkelsen*, 404 P.3d at 473–74; *see also Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 991 (10th Cir. 2021) ("Southwest's honest belief that Edmonds-Radford was unable to perform the essential functions of her position . . . was a legitimate, non-discriminatory reason for the termination.").

The burden therefore shifts back to Li. To survive summary judgment, she must produce

"sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener*, 334 P.3d at 546; *accord Mackey*, 459 P.3d at 382. Li does neither.

An employer's nondiscriminatory reason is pretextual if it (1) has no basis in fact, (2) was not really a motivating factor in the decision, (3) was not temporally connected to the adverse action, or (4) was not a motivating factor in employment decisions for other employees in the same circumstances. *Scrivener*, 334 P.3d at 546–47. Li makes no effort to place Northeastern's nondiscriminatory explanations into the second, third, or fourth category. She instead reiterates why she was qualified to perform the essential functions of the Marketing Manager position. Dkt. No. 42 at 11–12.[16] A jury could, according to Li, conclude that she was able to perform the essential functions with a reasonable accommodation, and that Northeastern "was aware of this but still chose to terminate her." *Id.* at 12 ("This raises doubt about the sincerity of [Northeastern]'s claim that [it] in good faith believed Li was unable to perform her job duties."). The Court construes this as a suggestion that Northeastern's neutral reason for termination—Li's inability to perform the essential job functions—has no basis in fact and was therefore pretextual.

The Court agrees with Li's premise for the reasons set forth above: a reasonable jury could indeed conclude that Li was qualified to perform the essential job functions with a reasonable accommodation. *See* Section II.B.2(a)(i). But it does not agree that that this factual issue proves Northeastern's otherwise nondiscriminatory explanation is "unworthy of credence," *Tex. Dep't of*

---

[16] Li also cites to portions of the record that she claims demonstrate her adequate performance. Dkt. No. 42 at 12. As Northeastern asserts, this argument conflates qualification to perform essential job functions with the second element of a disparate treatment claim—whether the employee was doing satisfactory work. *See* Dkt. No. 45 at 9 ("[Li] conflates her *ability* to perform any aspect of her job with her *level of performance* by arguing that her job performance did not factor in the termination."). Li was not terminated for performance deficiencies. Rather, she was terminated because "she had exhausted all leave . . . and [Northeastern] believed—based on her doctor's extreme restrictions— that she was unable to perform her job *at all*, even with an accommodation." *Id.*

*Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981), or "merely a pretext masking intentional discrimination," *Shokri v. Boeing Co.*, 311 F. Supp. 3d 1204, 1213 (W.D. Wash. 2018). An employee must "put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). Moreover, in judging the veracity of Northeastern's proffered justification, the Court does not determine whether that justification is objectively false, i.e., it does not assess whether Li was in fact qualified to perform the essential functions of her position with a reasonable accommodation. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). The employer need show only that it "honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Id.* (cleaned up); *see also Opara v. Yellen*, 57 F.4th 709, 727 (9th Cir. 2023) (employer's allegedly incorrect finding that employee committed violations "was not the equivalent of proving 'falsity'").

Li identifies no evidence of discriminatory animus beyond her disagreement with Northeastern's determination that she was not qualified to perform the essential functions of her position. That is insufficient to show pretext. Nor does Li otherwise show that discrimination was a "substantial factor" motivating Northeastern's decision to terminate her employment. *Scrivener*, 334 P.3d at 546.[17] Northeastern is therefore entitled to summary judgment on Li's disparate treatment claim.

### *(iii)* Retaliation Claim

To briefly recap, Li contends that Northeastern terminated her employment in retaliation

---

[17] Nowhere does Li attempt to show that Wamelink's explanation for the October 2019 PIP was pretextual beyond a conclusory assertion that "the criticisms of her performance were not made in good faith." Dkt. No. 42 at 11. It goes without saying that this falls short of what is required to survive summary judgment. *See Scrivener*, 334 P.3d at 546; *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006) (a disparate treatment plaintiff may not defeat a summary judgment motion by merely denying the credibility of the employer's proffered reason for the challenged action or by relying solely on her subjective belief that the challenged action was unnecessary or unwarranted).

for her accommodation requests. Dkt. No. 1-1 at 8. An employer may not discharge or otherwise discriminate against an employee for opposing a practice forbidden by the WLAD. Wash. Rev. Code § 49.60.210(1). An employee establishes a prima facie case of retaliation by showing that (1) she took a statutorily protected action; (2) she suffered an adverse employment action; and (3) a causal link exists between her protected activity and the adverse employment action. *Cornwell*, 430 P.3d at 234. The *McDonnell Douglas* framework applies to retaliation claims. *Mackey*, 459 P.3d at 381.

Li lists "several undisputed protected activities" that she engaged in: "requesting a standing desk for her disabilities in 2017"; "requesting reasonable accommodations in the form of FMLA leave, workers compensation paperwork, and an ergonomic evaluation in mid-2019"; "requesting continuous FMLA leave to accommodate her disability in December of 2019"; and "requesting modifications to sitting, eating, and typing time at work in August 2020." Dkt. No. 42 at 13. The Court agrees that these are statutorily protected actions. *See Bell v. Boeing Co.*, 599 F. Supp. 3d 1052, 1076 (W.D. Wash. 2022) (requesting an accommodation is protected activity). Li also identifies the same two adverse employment actions that she does for her disparate treatment claim: the October 2019 PIP and her August 2020 termination. Dkt. No. 42 at 13; *see Cornwell*, 430 P.3d at 234 n.4; *Davis*, 166 P.3d at 813.[18]

The third prima facie element is where the parties' dispute begins. Northeastern argues that the timing between some of Li's accommodation requests and her termination "is not remotely close enough" to support a causal connection. Dkt. No. 32 at 15; Dkt. No. 45 at 10. Li disagrees. She points to the fact that "she was subjected to [a] retaliatory performance improvement plan (PIP) issued shortly after requesting disability leave, worker's compensation [paper]work, and an

---

[18] As with Li's disparate treatment claim, the Court assumes without deciding that the PIP constitutes an adverse employment action.

ergonomic assessment," and notes that she was terminated "just three days . . . after" she submitted her ADA accommodation request. Dkt. No. 42 at 14. The Court assumes (again without deciding) that Li can establish a causal link between her protected activity and both adverse employment actions.[19]

But Li's retaliation claim goes no further. As discussed above, Northeastern has proffered "legitimate, nondiscriminatory, nonretaliatory reason[s]" for Li's PIP (including its supposed targeting of her FMLA leave) and termination. *Renz v. Spokane Eye Clinic, P.S.*, 60 P.3d 106, 109 (Wash. Ct. App. 2002). And Li again fails to rebut those neutral explanations. To prove pretext for her termination, she relies on "the email from Mel Shea to Jonathan Williams indicating that Li's management staff was eager to terminate her[.]" Dkt. No. 42 at 14.[20] This evidence is unavailing. As relevant here, Shea's July 2020 email to Williams indicated that "[t]he department [was] biting

---

[19] The Court doubts whether Li establish this causal link with respect to some of her protected activity. To prove causation, an employee must show that retaliation was a "substantial factor" motivating the employer's adverse action. *Cornwell*, 430 P.3d at 235. Washington courts have repeatedly held that an employee satisfies the causation element when "(1) the employee took a protected action, (2) the employer had knowledge of the action, and (3) the employee was subjected to an adverse employment action." *Id.* (emphasis omitted); *see, e.g., Currier*, 332 P.3d at 1013; *Kahn v. Salerno*, 951 P.2d 321, 332 (Wash. Ct. App. 1998); *Graves v. Dep't of Game*, 887 P.2d 424, 427 (Wash. Ct. App. 1994). Li has technically done that here. On the other hand, however, Washington courts have looked to "the employer's knowledge of the protected activity and the proximity in time between that activity and the termination" to evaluate causation. *Mackey*, 459 P.3d at 384; *Vasquez v. State*, 974 P.2d 348, 353 (Wash. Ct. App. 1999) ("Among the factors suggesting retaliatory motivation is proximity in time between the discharge and the protected activity; another factor is satisfactory work performance and evaluations."). Under this latter test, Li would likely fail to establish causation with respect to her request for a standing desk in the fall of 2017—a request that occurred nearly two years before the October 2019 PIP and almost three years before her August 2020 termination. Her other protected activity poses a closer question. For example, Li requested an ergonomic evaluation and intermittent FMLA leave in May 2019, went on intermittent FMLA leave between June and December 2019, and received the PIP in October 2019. The temporal proximity surrounding her continuous FMLA leave (December 2019 to July 2020), ADA accommodation request (August 2020), and termination (August 2020) likewise poses a much closer question. *See Wilmot v. Kaiser Aluminum & Chem. Corp.*, 821 P.2d 18, 29 (Wash. 1991) ("Discharge some length of time after the employee's [protected activity] will be less likely to reflect an improper motive[.]"); *compare Ellorin v. Applied Finishing, Inc.*, 996 F. Supp. 2d 1070, 1091 (W.D. Wash. 2014) (eight months between protected activity and adverse employment action was insufficient to establish temporal proximity), *with Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1383 (W.D. Wash. 2019) (one month between protected activity and adverse employment action was sufficient proximity to establish causation), *Mackey*, 459 P.3d at 384 (termination occurred "just 12 days" after employee engaged in protected behavior), *and Estevez v. Fac. Club of Univ. of Wash.*, 120 P.3d 579, 590, 591 (Wash. Ct. App. 2005) (termination occurred nine days after employee engaged in protected activity).

[20] Li does not provide any evidence or argument to show that Northeastern's explanation for the PIP was pretextual.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY - 38

1    at the bit to terminate [Li's] position asap." Dkt. No. 26-8 at 110. Shea later clarified in her

2    deposition that management was "eager to get Ms. Li back to work, or if she couldn't come back

3    to work, then to fill the position as soon as possible." Dkt. No. 46-1 at 37. Even so, nothing about

4    Shea's email suggests that Northeastern wished to terminate Li's employment *because* she sought

5    an accommodation. Discerning retaliatory intent in this email requires an additional inferential

6    step unsupported by any evidence: that management was "biting at the bit" to terminate Li because

7    she requested accommodations, rather than, say, a neutral need to fill the position with someone

8    who could perform the work.[21]

9        Other than the Shea email, Li repeatedly emphasizes the fact that Northeastern terminated

10   her employment three days after she submitted an ADA accommodation request. Dkt. No. 42 at

11   14.[22] The Court agrees that this close temporal proximity is likely sufficient to satisfy the causal

12   element of Li's prima facie retaliation claim. But that temporal proximity alone does not also prove

13   pretext. *See Mackey*, 459 P.3d at 387–88 (distinguishing the "fairly low" burden of establishing a

14   causal connection for purposes of the third prima facie element from the heightened burden of

15   presenting evidence sufficient to show pretext under the third step of *McDonnell Douglas*); *cf.*

16   *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013) (although close proximity

17

---

18   [21] Contrary to Li's suggestion, Shea's email is not "direct evidence of retaliation and discrimination against [her] for

19   seeking to accommodate her disabilities." Dkt. No. 42 at 14. Direct evidence of discriminatory intent is "rare." *Crabtree v. Jefferson Cnty. Pub. Hosp. Dist. No. 2*, 500 P.3d 203, 211 (Wash. Ct. App. 2021). In the Ninth Circuit's words, such evidence includes "clearly sexist, racist, or similarly discriminatory statements or actions by the

20   employer." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005); *see, e.g.*, *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (supervisor stated that he "did not want to deal with another female";

21   collecting examples of direct evidence of discriminatory motive); *Alonso v. Qwest Commc'ns Co., LLC*, 315 P.3d 610, 616 (Wash. Ct. App. 2013) (supervisor referred to Mexicans as "Spics," openly mocked plaintiff's accent by referring to it as "ghetto Hispanic," and stated that he hated veterans who "served in the first Gulf War for five days and

22   claim[ed] a disability." ). That an employer is eager to terminate a position does not necessarily suggest retaliation or indicate that discrimination is afoot.

23   [22] Nowhere does Li confront, address, or even acknowledge a significant fallacy in her theory that Northeastern terminated her in retaliation for submitting an ADA accommodation request: Northeastern invited her to apply for an

24   ADA accommodation. Indeed, Feggins followed up with Li about submitting the appropriate forms and worked closely with her to answer accommodation-related questions. *See* Dkt. No. 33-1 at 120–27.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY - 39

was sufficient to establish a prima facie case, it did not overcome the employer's legitimate, nondiscriminatory reason for termination); *Hooker v. Parker Hannifin Corp.*, 548 F. App'x 368, 370 (9th Cir. 2013) (same).

Li therefore presents no evidence that Northeastern's actions "were actually driven by retaliatory intent." *Shokri*, 311 F. Supp. 3d at 1222. And this case does not present the "close call" necessary to submit the issue of pretext to the jury. *Matson v. United Parcel Serv., Inc.*, 872 F. Supp. 2d 1131, 1144 (W.D. Wash. 2012). The evidence to which Li points simply would not permit a reasonable jury to conclude that either the PIP or her termination was a pretextual excuse concealing retaliatory motives, or that retaliation was a substantial factor in those adverse actions. Northeastern is therefore entitled to summary judgment on Li's retaliation claim.

### (c) *Affirmative Defenses*

Li seeks summary judgment on four of Northeastern's affirmative defenses. Dkt. No. 38 at 13–15. Where, as here, "the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact . . . by showing that the nonmoving party lacks evidence of an essential element of its . . . defense." *Dunn v. City of Seattle*, 420 F. Supp. 3d 1148, 1156 (W.D. Wash. 2019) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000)). To defeat such a showing, the defendant, "as the party who carries the burden of proof on an affirmative defense, . . . must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Washington v. Matheson Flight Extenders, Inc.*, 440 F. Supp. 3d 1201, 1222 (W.D. Wash. 2020) (cleaned up).

### (i) Affirmative Defense No. 3: Undue Hardship

Northeastern alleges in its answer that "[a]ny medically necessary accommodation [Li] claims she requested would have constituted an undue hardship for [Northeastern]." Dkt. No. 12

at 8. Li argues that Northeastern "has produced no evidence that alternative job assignments, working with physical restrictions, and speech to text were undue hardships." Dkt. No. 50 at 8; *see also* Dkt. No. 38 at 13–14. Northeastern believes that this affirmative defense "may be unnecessary" if Li "concedes that the only accommodation that she actually requested to return to work was a specific brand of speech-to-text technology[.]" Dkt. No. 47 at 20. The Court need not address this qualified withdrawal. Because Li has shown that Northeastern lacks evidence to support this defense, she is entitled to summary judgment on the issue. *See Dunn*, 420 F. Supp. 3d at 1156.

To recap, an employer must reasonably accommodate an employee's disability unless doing so would impose an undue hardship on the employer's business. *Dedman*, 989 P.2d at 1220. "'Undue hardship' is an employer's last defense; one that it may assert when an otherwise qualified employee could ordinarily be reasonably accommodated but cannot in a particular case, based on typically case-specific circumstances." *Kries*, 362 P.3d at 995. An accommodation is an undue hardship if the attendant cost and difficulty are unreasonable considering the following three factors: (1) "[t]he size and resources available to the employer"; (2) "[w]hether the cost can be included in planned remodeling or maintenance"; and (3) "[t]he requirements of other laws and contracts, and other appropriate considerations." Wash. Admin. Code § 162-22-075.

Whether and at what point an employee's requests would have resulted in an undue hardship is generally a jury question. *Phillips*, 766 P.2d at 1103; *accord Easley v. Sea-Land Serv., Inc.*, 994 P.2d 271, 278 (Wash. Ct. App. 2000) ("[I]t is for the trier of fact to decide at what point continued attempts to accommodate become an undue burden as opposed to a reasonable requirement."). Here, however, Northeastern has produced no evidence in support of this affirmative defense. Nothing in the record suggests that providing Li with an otherwise reasonable accommodation was disproportionately expensive or imposed too great a burden on Northeastern's

business operations. *See Kries*, 362 P.3d at 995. The only evidence in the record that addresses undue hardship is Morris's expert report and the deposition testimony of Northeastern's Rule 30(b)(6) representative, Susan Uhl-Miller. Neither creates a genuine issue of fact for trial.

Morris opines in passing that "[f]or business reasons, it was determined the university was unable to meet restrictions or provide further accommodation." Dkt. No. 39-1 at 49. She does not expand on those "business reasons" or offer any explanation as to why Northeastern could not "meet" Li's restrictions or provide an accommodation. Uhl-Miller's testimony fares no better. She alluded to "resources that were brought in" while Li was on FMLA leave and claimed that this "resource allocation was not sustainable." *Id.* at 91. According to Uhl-Miller, it would have posed a hardship for Northeastern "to continue [Li's] period of extended leave beyond this eight- or nine-month period[.]" *Id.* This assertion does not address the cost or general feasibility of Li's requested accommodation (speech-to-text software), an ergonomic evaluation, other assistive technology, or job reassignment. Indeed, Uhl-Miller conceded that she did not know whether purchasing new speech-to-text software for Li would have created an undue hardship for Northeastern. *Id.* at 95–96. Nor was she aware of any "cost analysis" performed with respect to an ergonomic assessment of Li's workstation. *Id.* at 95. Li's motion for partial summary judgment is therefore granted as to this affirmative defense.

*(ii)* Affirmative Defense Nos. 2 and 4: Good Faith

Northeastern pleads two "good faith" affirmative defenses. The first is its "Good Faith Interactive Process" defense, which contends that Northeastern "engaged in a good faith interactive process with [Li] regarding any alleged medical condition(s) and the need for any workplace accommodation." Dkt. No. 12 at 8. The second is its "Good Faith" defense, which more broadly alleges that Northeastern's conduct "was reasonable and undertaken in good faith, with reasonable grounds for believing that [its] actions did not violate the law." *Id.* Li moves for

summary judgment on both. Dkt. No. 38 at 14–15; Dkt. No. 50 at 7.

The Court agrees with Li that there is no good faith affirmative defense to a WLAD failure to accommodate claim. Dkt. No. 38 at 15. Northeastern highlights the comment to Washington Pattern Jury Instruction 330.33, which indicates that "[i]f there is a factual question whether the parties cooperated in the reasonable accommodation process, Washington law is unclear how non-cooperation impacts the burden of proof." *See* Dkt. No. 47 at 19. Northeastern therefore "cautiously asserted" this defense "[g]iven this lack of clarity[.]" *Id.* To succeed on her failure to accommodate claim, Li must prove (among three other elements) that Northeastern failed to reasonably accommodate her disability. *See LaRose*, 437 P.3d at 721. And whether Northeastern reasonably accommodated her disability turns on its participation in the interactive process. *See Frisino*, 249 P.3d at 1050. Thus, Northeastern's contention that it partook in a good faith interactive process seeks to demonstrate that Li has not met her burden of proof on an element of her reasonable accommodation claim. That is not an affirmative defense. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002); *cf. Kaiser v. CSL Plasma Inc.*, 240 F. Supp. 3d 1129, 1134 (W.D. Wash. 2017). Li's motion for partial summary judgment is granted as to this affirmative defense. However, because this "affirmative defense" is simply a challenge to Li's prima facie case, and because Northeastern has otherwise preserved this challenge, *see, e.g.*, Dkt. No. 12 at 7, Northeastern may raise that challenge at trial.

With respect to Northeastern's broader "Good Faith" affirmative defense, Li contends that it should be dismissed as a matter of law because Northeastern "has provided no authority stating it applies to this type of case." Dkt. No. 50 at 7. Northeastern offers no argument in support of this affirmative defense beyond its conclusory assertion that neither of its good faith defenses should be dismissed. *See* Dkt. No. 47 at 19. The Court is unaware of any authority holding that an employer's general good faith is an affirmative defense to a claim under the WLAD for failure to

accommodate, retaliation, or disparate treatment (the latter two of which are no longer relevant, as the Court dismissed those claims). Nor is an employer's good faith relevant to the determination of damages. *See Dailey v. N. Coast Life Ins. Co.*, 919 P.2d 589, 590–92 (Wash. 1996) (punitive damages are unavailable under the WLAD); *Rawson v. Recovery Innovations, Inc.*, No. C17-5342-BHS, 2022 WL 4355839, at *6 (W.D. Wash. Sept. 20, 2022) (same). It appears, then, that this affirmative defense merely challenges Li's prima facie case. *See Zivkovic*, 302 F.3d at 1088; *cf. Bushbeck v. Chi. Title Ins. Co.*, No. C08-0755-JLR, 2010 WL 11442904, at *5 (W.D. Wash. Aug. 26, 2010). Li is thus entitled to summary judgment on this affirmative defense. Again, however, to the extent the good faith "affirmative defense" is instead a challenge to Li's prima facie case, and to the extent Northeastern preserved its challenge (e.g., through factual denials in its answer), it may raise that challenge at trial.

### *(iii)* Affirmative Defense No. 5: Business Necessity

Li also challenges Northeastern's business necessity affirmative defense. Dkt. No. 38 at 15. Northeastern titles this defense "Job-Related Conduct" in its answer, but the explanatory description indicates that this is a business necessity defense: "[Northeastern]'s conduct was job-related and justified by business necessity." Dkt. No. 12 at 8. Business necessity is typically a defense (but not an affirmative defense) in disparate treatment cases. *See, e.g.*, *Hegwine v. Longview Fibre Co., Inc.*, 172 P.3d 688, 697 (Wash. 2007). Again, though, the Court has granted Northeastern summary judgment on Li's disparate treatment claim. And the Court has found no authority suggesting that business necessity is an affirmative defense to failure to accommodate—the only surviving claim. The Court thus dismisses this affirmative defense as well.[23]

---

[23] Northeastern also agreed to withdraw this affirmative defense if Li conceded that she would not "present any argument or evidence of a disparate impact[.]" Dkt. No. 47 at 18 ("[A]lthough Plaintiff has not pled disparate impact, she may seek to argue at trial that Northeastern's policies have a disparate impact on a particular subset of disabled workers."). Li thereafter indicated in her reply brief that she "is not arguing *disparate impact*[,] therefore [Northeastern]'s affirmative defense for business necessity should be dismissed." Dkt. No. 50 at 7.

1
2
3
4
5

**C.    Motion to Exclude**

Northeastern asks the Court to exclude Li's proffered ADA expert, Peter Blanck, "because his opinions are irrelevant, unfairly prejudicial, unreliable, and constitute inadmissible legal opinions." Dkt. No. 30 at 2. The Court agrees that Dr. Blanck's opinions are unreliable and constitute legal conclusions.

6

    1.    Dr. Blanck and His Opinions

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Dr. Blanck is a University Professor at Syracuse University and Chairman of the Burton Blatt Institute, an organization that "works to advance the civic, economic, and social participation of persons with disabilities across the life course." Dkt. No. 31-1 at 4. He received his Juris Doctorate from Stanford University and, before that, his Ph.D. in Social Psychology from Harvard University. *Id.* Dr. Blanck has "published more than 200 articles and books" on the ADA and "related federal and state disability civil rights laws, policies, and practices[.]" *Id.* His work is published in peer-reviewed journals, law reviews, and "other scholarly venues." *Id.*; *see also, e.g.*, *id.* at 19 ("I have published in the *Human Resources Management* one of the largest empirical investigations of reasonable accommodations for employees with disabilities."). As particularly relevant here, Dr. Blanck regularly "advise[s] employers, human resource and health care professionals, and others, on reasonable accommodations and the associated 'interactive process' . . . in the employment of individuals with disabilities." *Id.* at 4–5. This work entails extensive study of "employers' practices in validly assessing job qualifications and descriptions and reasonable accommodations in the workplace"; "organizational deficiencies in the accommodation and interactive process"; and "individualized determinations in the accommodations process, which may enable qualified individuals with disabilities to perform essential job functions productively." *Id.* at 5–6.

24

Dr. Blanck offers two opinions in his report. First, he concludes that Northeastern's

1    "actions in connection with Ms. Li's known medical condition, her doctor's requests for reasonable

2    accommodation, and the associated interactive process, did not comport with well-recognized

3    practice and research regarding the employment of Li as a person with disabilities." *Id.* at 18; *see*

4    *also, e.g.*, *id.* at 20 (finding that Northeastern "fail[ed] to engage in an earnest interactive process"

5    with Li). And second, he opines that Li "likely could have performed the essential functions of her

6    job with reasonable accommodation." *Id.* at 23; *see also, e.g.*, *id.* at 26 ("My preliminary review

7    leads me to reject counterhypotheses that [Li] was neither potentially qualified to perform the

8    essential functions of her job with or without reasonable accommodation nor motivated to work

9    for Northeastern.").

10              2.    Admissibility under Rule 702

11          An expert may testify based on his "scientific, technical, or other specialized knowledge"

12   if it "will help the trier of fact to understand the evidence," provided that the testimony rests on

13   "sufficient facts or data" and "reliable principles and methods," and the expert "has reliably applied

14   the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). The Court's role at

15   this stage is that of "gatekeeper," and at the gatekeeping stage the relevant inquiry is limited to

16   whether Dr. Blanck's testimony "both rests on a reliable foundation and is relevant to the task at

17   hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Elosu v. Middlefork*

18   *Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022) ("Although a district court may screen an expert

19   opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the

20   expert's conclusions or assume a factfinding role."). Li bears the burden of proving by a

21   preponderance of the evidence that Dr. Blanck's testimony is admissible. *Lust v. Merrell Dow*

22   *Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). This she fails to do.

23          The Court does not question whether Dr. Blanck is qualified to testify about reasonable

24   accommodations in the workplace. His extensive experience, abundant scholarly publications, and

impressive credentials speak for themselves. The Court concludes, however, that Dr. Blanck's report is devoid of any discernable methodology, and therefore must be excluded. *See, e.g.*, *Rhine v. Buttigieg*, No. 2:20-CV-01761-RAJ-BAT, 2022 WL 7729817, at *3 (W.D. Wash. Sept. 15, 2022) (expert "employed no discernable methodology in reaching his opinions" and instead "relied upon his experience and read the materials and offered his opinions").

Expert opinion testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (cleaned up). "To evaluate reliability, the district court 'must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.'" *Elosu*, 26 F.4th at 1024 (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)). The Court need not delve extensively into the *Daubert* factors. Li simply fails to show that Dr. Blanck's proposed testimony is "the product of reliable principles and methods," or that Dr. Blanck reliably applied those "principles and methods to the facts of th[is] case." Fed. R. Evid. 702(c)–(d).

Dr. Blanck's report is an amalgamation of untethered general principles on employee-employer dynamics, observations on difficulties and biases disabled individuals face in the workplace, a narrative of the evidence in this case, and ipso facto conclusions. The report, distilled to its purest form, "merely provide[s] his summary of the evidence and tell[s] the jury what result to reach." *Rhine*, 2022 WL 7729817, at *3; *Easton v. Asplundh Tree Experts, Co.*, No. C16-1694-RSM, 2017 WL 4005833, at *3 (W.D. Wash. Sept. 12, 2017) ("[E]xpert testimony that merely tells the jury what result to reach is inadmissible."). Thirty-two pages and 110 footnotes do not overcome Dr. Blanck's fatal omission of an indispensable component to any reliable opinion: an explanation of his methodology and how he applied it to reach his conclusions.

In the "Methodology for Review and Analysis" section of his report, Dr. Blanck indicates that his "research methods" included a review of the following: "case materials, court filings, medical reports, and other case file documents"; "Northeastern's policies and practices, and materials relevant to its employees with disabilities"; "publicly available reports and social science literature"; and an interview with Li. Dkt. No. 31-1 at 16–17 ("The additional materials I examined include peer-reviewed scientific journals, reports, ADA, EEOC, and Washington State[] regulations, guidance, and policies."). According to Dr. Blanck, "[t]he documents [he] reviewed allow [him] to make a preliminary analysis of [Li's] accommodation request, and [Northeastern's] policies and practices, as applied to [Li] as a Northeastern employee with a disability in the current circumstances." *Id.* at 17. He further references "review techniques" and "research methods" without ever explaining what they are or how he applies them to the facts of this case: "My review techniques, along with the other recognized research methods I employ, strengthen my ability to consider plausible rival hypotheses for the outcomes I find . . . . My approach reduces material selection bias and increases the external validity and relevance of my opinions in this matter." *Id.* This is subjective and conclusory. Again, Dr. Blanck never indicates how those methods supposedly strengthen his analytical abilities and never details how he makes the leap from his experience and research to the conclusions here. In essence, he asks the Court to take his word for it. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (a district court must exclude opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert."); *Powell v. Anheuser-Busch Inc.*, CV-09-729-JFW (VBKx), 2012 WL 12953439, at *6 (C.D. Cal. Sept. 24, 2012) (vocational rehabilitation expert relied "on the mere fact of his experience" to support his conclusions and essentially asked the Court "to take his word for it"; this "subjective, conclusory approach" could not "reasonably be assessed for reliability").

Nor does Dr. Blanck's substantive discussion reveal an identifiable methodological

approach or otherwise restore the Court's faith that reliable principles and methods were employed. It contains, as noted, a great deal of generalized background observations about the benefits of the interactive process derived from conclusory summations of his research. *See, e.g.*, Dkt. No. 31-1 at 18–19 ("Research, my own and by others, shows [that] deficient employer processes involving employees with disabilities may be mitigated when employers conduct meaningful individualized accommodation analyses using the interactive process[.]"); *id.* at 19 ("Studies show a valid good faith interactive process by employers facilitates effective accommodations to qualified employees with disabilities across a range of situations."); *id.* at 20 ("[A] majority of employees with disabilities who received accommodations, and their managers, report the accommodation had positive impacts, such as increased productivity of the employee with a disability and the workgroup."); *id.* at 25 ("For employees with disabilities such as [Li], an effective accommodation and interactive process were crucial because persons with serious and often hidden disabilities are among those minority groups most stigmatized in employment.").

Dr. Blanck makes no effort to explain the significance of this information or how he applied it to the facts of this case beyond his observation that other employers have "grant[ed]" the "types of accommodations that [Li] requested in this matter." *Id.* at 19. He instead summarily concludes that Northeastern's failure to engage in an interactive process "appears contrary to standard human resources practice." *Id.* at 20; *see also id.* at 26 ("Standard and commonsense reasonable accommodation policy and practice would dictate that . . . Northeastern should have (and could have) addressed the accommodation requests and reviewed them in good faith[.]"). This is insufficient. *See Arjangrad v. JPMorgan Chase Bank, N.A.*, No. 3:10-CV-01157-PK, 2012 WL 1890372, at *4–5 (D. Or. May 23, 2012) (finding attorney with extensive experience qualified to testify but excluding his opinion because he "never explain[ed] how his experience performing discrimination investigations or his expertise advising employers and HR professionals led him to

1    understand and define generally accepted standards of HR investigation practices."); *Easton*, 2017

2    WL 4005833, at *4–5 (although attorney had "decades of experience in employment law, primarily

3    representing and advising large employers on employment law issues," his testimony was

4    unreliable because he never explained "how his experience led him to understand and define 'HR

5    best practices,'" and instead "merely assert[ed] that certain actions taken by Defendant [were]

6    'consistent with HR best practices' and therefore reasonable").

7        Dr. Blanck's assertions with respect to what an interactive process and reasonable

8    accommodation would have looked like in this case suffer from the same deficiency. *See* Dkt. No.

9    31-1 at 20–22. He simply fails to explain in nonconclusory fashion why Northeastern should have

10   taken the steps he now identifies beyond unadorned and unexplained footnote citations to scholarly

11   journal articles and group studies. *Id.* at 21. Dr. Blanck sometimes guises his conclusory statements

12   as supported analysis by prefacing them with vague references to what "research" and "studies"

13   show, or by employing phrases like "based on my research and experience," "in my experience,"

14   and "in accord with well-recognized sources"—but he never returns to connect the dots, expound

15   on those passing references, or otherwise explain how he applied those sources and why they are

16   significant. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (an expert must

17   employ "the same level of intellectual rigor" regardless of whether his testimony is based "upon

18   professional studies or personal experience"); *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d

19   1223, 1246 (W.D. Wash. 2018) (noting that experts who "rely primarily on experience must

20   explain 'how that experience leads to the conclusion reached, why that experience is a sufficient

21   basis for the opinion, and how that experience is reliably applied to the facts.'" (quoting Fed. R.

22   Evid. 702, Advisory Committee's Note to 2000 Amendments)). The Court is not suggesting that

23   Dr. Blanck must map out every single inferential step; however, he must at some point articulate

24   a coherent explanation as to why his previous studies and experience lead to his conclusions.

The Court again emphasizes that it harbors no doubt as to Dr. Blanck's qualifications. But his report fails to articulate a verifiable methodological approach. Nowhere does he explain how his research and experience lead to the conclusions he reached, why that experience and research are a sufficient basis for his opinions, or how that experience and research are reliably applied to the facts. *Moussouris*, 311 F. Supp. 3d at 1246; *cf. Bell v. Boeing Co.*, No. 20-CV-01716-LK, 2022 WL 1206728, at *8 (W.D. Wash. Apr. 22, 2022) (doctor's report did not "articulate a methodological approach" or "set forth the scientific procedure" that a doctor in his field might apply). The dispositive question "is whether an expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *SQM N. Am. Corp.*, 750 F.3d at 1046 (quoting Fed. R. Evid. 702, Advisory Committee's Note to 2000 Amendments). Dr. Blanck's report falls in the latter category. It must therefore be excluded.

### 3.  Legal Conclusions

In any event, a significant portion of Dr. Blanck's report is comprised of inadmissible legal conclusions. Expert testimony that embraces an ultimate issue is not per se improper. Fed. R. Evid. 704(a); *see Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." (cleaned up)). However, an expert cannot "give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Hangarter*, 373 F.3d at 1016 (cleaned up). Several assertions in Dr. Blanck's report run afoul of this standard. *See, e.g.*, Dkt. No. 30 at 11 (cataloguing some of Dr. Blanck's legal conclusions). Indeed, his two main opinions—that (1) Northeastern's actions "did not comport with well-recognized practice and research regarding the employment of Li as a person with disabilities" and (2) Li "likely could have performed her job with or without reasonable accommodation"—are impermissible legal conclusions. Dkt. No.

31-1 at 18, 23. The Court would accordingly exclude this opinion testimony even if Dr. Blanck's methodology was reliable. *See, e.g.*, *Easton*, 2017 WL 4005833, at *5 (expert's opinion that company policies were adequate and its actions reasonable was an impermissible legal conclusion); *Donelson v. Providence Health & Servs.-Wash.*, 823 F. Supp. 2d 1179, 1193 (E.D. Wash. 2011) (testimony that unpaid leave was a reasonable accommodation available to the defendants amounted to a legal conclusion); *Banga v. Kanois*, No. 16-CV-04270-RS, 2020 WL 9037179, at *3 (N.D. Cal. Dec. 9, 2020) (prohibiting expert from testifying whether defendant reasonably accommodated plaintiff's disabilities).

### III.   CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Northeastern's Motion for Summary Judgment, Dkt. No. 32, GRANTS IN PART and DENIES IN PART Li's Cross Motion for Partial Summary Judgment Re Failure to Accommodate, Dkt. No. 38, and GRANTS Northeastern's Motion Under LCR 16(b)(4) to Exclude Plaintiff's Proffered "ADA Expert," Dkt. No. 30.

Dated this 30th day of May, 2023.

Lauren King
United States District Judge